OPINION OF THE COURT
Saxe, J.
Defendant’s conviction of rape in the second degree and facilitating a sex offense with a controlled substance was not only supported by legally sufficient evidence, but the weight of the evidence was overwhelming, and the trial court’s Molineux ruling does not justify reversal.
The charge of rape in the second degree (Penal Law § 130.30 [2]) is based on defendant’s having had sexual intercourse with the complainant while she was mentally incapacitated due to narcotic or intoxicating substances administered to her without her consent, and the charge of facilitating a sex offense with a controlled substance (Penal Law § 130.90 [1]) is based specifically on defendant’s administering MDMA (methylenedioxymethamphetamine), commonly called Ecstasy, to the complainant without her knowledge or consent in order to facilitate the subsequent sex offense.
The trial evidence offered by the People included the testimony of the complainant and two other young women present for some of the events, along with the testimony of a police detective, a physician, and an expert toxicologist, as well as the results of forensic testing and recordings of statements made by defendant. The complainant testified that she met defendant, who identified himself as a Los Angeles-based talent agent, at a “Talent Expo” in Texas in November 2006, when she was a high school senior, and that thereafter defendant called her numerous times about her plans for a career in entertainment. *167 He repeatedly encouraged her to move to Los Angeles, where he said he would pitch her demo tape to a record label and introduce her to influential people in the entertainment industry. But, rather than move to Los Angeles after graduating from high school, in the fall of 2007, the complainant enrolled at the New York Conservatory of Dramatic Arts. On September 3, 2007, defendant called her and proposed that she meet with him while he was in Manhattan on September 11, 2007, suggesting that they go to a restaurant called Tao.
At about 5:00 p.m. the complainant arrived at the address defendant had given her, and he escorted her from her taxicab into his hotel room. There, she accepted defendant’s offer of a drink. He prepared two blue-colored alcoholic drinks called “Hpnotiq,” and served her one, which she drank. After the two read some scenes together, at defendant’s suggestion they went to a clothing store near the hotel, where defendant suggested to the complainant that she choose clothing that would show her style. At approximately 7:30 p.m. defendant bought the complainant a dress of her choosing to wear for the evening.
They then walked back to defendant’s hotel room, which took no more than 10 minutes, and upon arriving at the hotel room, defendant provided the complainant with a glass of wine, which she drank between approximately 7:40 and 8:15 p.m. The two then left the hotel to go to Tao. The complainant testified that in the taxi on the way to the restaurant, she felt “a little bit light-headed,” “a lot more relaxed,” and “happy” from the drinks she had consumed.
At the restaurant, defendant ordered the complainant a drink from the bar. She testified that before drinking it, she noticed that her vision had become “slightly fuzzy,” an effect she had not previously experienced as a result of drinking alcohol. She drank that drink between 8:15 and 8:30 p.m., although she could not recall how many sips she had. A short time later, the pair was joined by two young women who, it turned out, were classmates of the complainant at the Conservatory. Defendant ordered another round of drinks for all four of them while they waited to be seated at a table. According to the two young women, the complainant was behaving in an unusually “touchyfeely” manner with defendant, and while one of them testified that she did not seem to be drunk at this point, the other testified that she seemed intoxicated in that she was very talkative and very “loose.” Defendant and the three women were soon seated for dinner at a table on the second floor of the restaurant.
*168 It is at this point that the complainant’s memory of the evening’s events stops; she testified that she could not remember anything that happened from that point until she woke up in defendant’s hotel room the next morning. However, the testimony of her two classmates described the complainant’s conduct through much of the rest of that evening.
Defendant ordered another round of drinks after the group was seated at their table; during dinner, the complainant consumed three or four drinks. In the view of both young women, the complainant’s conduct grew more unusual: she seemed “a lot less stable,” was “rocking back and forth,” “kept reaching out for” her friend’s arm, and “kept on repeating her words” to the point where she “had the same conversation over and over again.” She was “swaying back and forth,” was “leaning all over [defendant]” and “rubbing his thighs and knees,” and appeared to be “beyond just being intoxicated.”
The group left the restaurant around 10:45 p.m. and took a limousine to a club called Marquee. In the limousine, the complainant seemed to be “in her own fantasy world,” acting in a “very sensual” manner — singing to herself with her eyes closed, rocking back and forth, and rubbing her body, including her upper thighs, in an unusual way. Inside the club, she consumed more drinks, although she was stumbling and unstable, and was not making sense. She danced with a friend of defendant’s named Theo, who met the group at the club at approximately 11:30 p.m. Theo testified that he saw the complainant finish three drinks at the club.
The other two young women left Marquee at about 12:30 a.m. Defendant left the club with the complainant some time later, while Theo remained there. Video surveillance footage from the Parker Meridien Hotel showed that defendant and the complainant arrived back at the hotel shortly after 1:00 a.m. The video did not reflect any unsteadiness on the complainant’s part.
The next thing the complainant remembered was waking up, naked, in the bed in defendant’s hotel room the following morning at about 8:30. She testified that when she woke up, she initially could not feel or move any part of her body below her neck, but that after a few seconds, she was able to wiggle her fingers, and then began to get feeling back in the rest of her body. She put on the clothes she had been wearing when she arrived at the hotel room the previous day. Defendant was in the bathroom and the shower was running. When she told him that she had to leave to make a 9:00 a.m. class, he came out of the *169 bathroom, gave her $20 for cab fare, and told her he would call her later.
While sitting in class that morning, the complainant was worried, afraid, and confused, because she could not remember anything that had happened after she sat down for dinner at the restaurant the night before. When she ran into one of the classmates who had been with her and defendant at the restaurant and club the previous night, she asked what had happened that night, confiding that she could not remember anything and had woken up naked in defendant’s hotel room. Both women began to cry. Although the classmate described the events of the previous evening, the complainant still did not recall anything. The complainant ultimately decided to go to a hospital to find out “if anything had happened” to her.
At about 6:00 p.m. on September 12, 2007, the complainant went to Long Island College Hospital in Brooklyn. The examining physician, Dr. Bernadith Russell, concluded based on her examination of complainant and her account of the events— including the gap in her memory — that the complainant might have been the victim of a “drug facilitated” sexual assault. Dr. Russell prepared a “drug facilitated sexual assault kit,” which included urine and blood samples, and a “sexual assault rape evidence kit,” which included oral, anal, and vaginal swabs.
At approximately 11:15 p.m. on September 12, 2007, Detective Julia Collins responded to the hospital, interviewed the complainant, and took custody of the examination kits prepared by Dr. Russell.
On the evening of September 13, 2007, in the police station and at the direction of the police, the complainant made a controlled phone call to defendant in which she told him that she did not know why she had awakened in his room with no clothes on and that she did not remember anything that happened after they began dinner the previous night. Defendant replied that after they returned to the hotel room, she expressed the desire to go out again, but he told her that they could “keep partying some more” in the room because Theo would be coming over with some friends, but she then fell asleep on the couch. Defendant said he called Theo “a couple of times” to see if he and his friends were still planning to come over, but they decided not to. Defendant then moved her to the bed and got in bed with her. He told her that although she later woke him up “being really frisky” with him, he did not have sex with her because he did not have a condom.
*170 Laboratory tests on the evidence from the rape kits established the presence of Ecstasy in the complainant’s blood, and semen in the vaginal and anal swabs, as well as on her underwear. The complainant’s blood and urine samples were also tested for the presence of the drug GHB, but GHB was not detected in her system; however, because GHB is metabolized rapidly, it would not be expected to be found in the blood after eight hours or in the urine after 12 hours.
The complainant denied knowingly taking Ecstasy on the night of September 11, 2007, or the morning of September 12, 2007, or at any other time. Further, she testified that she never consented to any kind of sexual contact with defendant.
At the direction of the police, the complainant arranged to meet defendant on December 17, 2007, but at the appointed time, Detective Collins arrived to meet defendant in place of the complainant. Defendant voluntarily accompanied the detective to the 13th Precinct for questioning.
In the statement defendant gave Detective Collins, he said he did not recall either the complainant or himself having any drinks when she came to his hotel room. He stated that when they returned to the hotel at the end of the night, the complainant transformed from “nice” to “wild” and “wanted to continue partying.” He said he texted and called Theo several times and that Theo called him and asked him to go out again, but, while defendant was in the bathroom, the complainant fell asleep on the sofa, so he covered her up and went to bed. When he awoke in the middle of the night he found the complainant “trying to have sex with him.” However, he said, he did not have sex with her because he did not have a condom. Defendant also denied using drugs, and had no explanation of why the complainant had no memory of the night’s events, although he speculated that “perhaps something happened” at the night club where “some guys at another table (were) trying to lure girls over there.”
Defendant voluntarily provided an oral swab for purposes of DNA analysis. Based on results of that test, it was determined that defendant was the source of the semen found on the complainant’s vaginal swab and underwear.
Two prosecution experts, Dr. Russell and forensic toxicologist Michael McGee, testified that much of the complainant’s reported behavior, as described by the prosecutor, was consistent with her having ingested Ecstasy with the glass of wine she drank at approximately 7:45 p.m., and also that the evidence *171 was consistent with her having ingested GHB later that night. Specifically, McGee testified that the evidence that the complainant had a glass of red wine at approximately 7:45 p.m. and was then observed “[l]aughing, being very tactile, touching and grabbing at both men and women, being very talkative, touching her own body” and “having somewhat blurred vision,” at about 8:30 p.m., was consistent with her having ingested Ecstasy at about 7:45 p.m. Dr. Russell agreed that the evidence was consistent with the complainant’s having ingested Ecstasy. While defendant correctly points out that the only testimony that the complainant was observed “touching her own body” that night indicated that this conduct first occurred in the taxicab on the way to Marquee at around 10:45 p.m., and not earlier, the rest of the behavior as described to the experts accurately reflected the testimony.
McGee testified that Ecstasy usually starts to take effect within one half hour of ingestion, and its effects can last “an hour or several hours,” depending upon the dose. Russell testified that the effects of Ecstasy can last “an hour and half, two hours.” Dr. Russell stated that loss of consciousness is a potential effect of Ecstasy, while McGee testified that unconsciousness was not a “normal result” of consuming Ecstasy but was more typical of GHB.
McGee testified that GHB, a “date rape drug,” has an “anesthetic or sedating effect on the nerves,” and can cause impaired memory or total memory loss. Russell agreed that GHB can cause loss of consciousness and memory loss, and stated that the drug usually begins to act within 20 minutes of ingestion, and its effects can last “about an hour and a half, two hours,” depending on the dosage. Both witnesses agreed that the evidence was consistent with the complainant’s having ingested GHB at approximately 1:30 a.m., after returning to the hotel room.
In addition to the foregoing evidence, the trial court, pursuant to its Molineux ruling, permitted the People to introduce the following testimony of the complainant’s classmate, Christine C., one of the two women who joined defendant and the complainant on the night in question, as well as that of another young woman, Brittney E., regarding their own experiences with defendant other than on the night in question.
Christine C. testified that she met defendant through her roommate, in August 2007, that he later called her about a potential audition, and that, hoping that he would become her *172 agent, she agreed to have dinner with him on September 10, 2007. When Christine met defendant at his hotel room at the Parker Meridien, he handed her a script to read and poured a glass of wine for each of them. She drank “not even half’ of this glass of wine and did not become intoxicated. For about 20 minutes, she and defendant acted out scenes from short audition scripts. At approximately 6:30 p.m., they left for dinner at Tao, where they had several drinks. After dinner, they stopped at another bar, where they had a shot of liquor, and then returned to defendant’s hotel room. There, defendant made a Hpnotiq for her, of which she took only one sip. He talked to her about her career prospects, and in response to her complaint about aching feet, began rubbing her feet and calves. After Christine pulled away, embarrassed that her legs were not shaved, defendant brought in shaving cream and a razor and began shaving them, at which point she pulled away again. She said defendant told her that it wouldn’t be a good idea “to be talking about what we’re doing because no one would understand the relationship between a manager and a client.” When defendant appeared to fall asleep while she was in the bathroom, she left the hotel room and went home.
Brittney E. testified that she met defendant at a talent showcase in Atlanta on July 20, 2008. Defendant told Brittney that she was a “quintuple threat” because she could sing, act, dance, model, and play the guitar, and told her that she had a “very marketable look.” Defendant called her several times in the week after the showcase, and when she informed him that she planned to attend the Musicians Institute in Hollywood in September 2008, he helped her arrange to rent an apartment in the complex where he lived. Defendant visited her in the apartment, had her do “runway walks” wearing a bathing suit, complimented her on her breasts and buttocks, and had her enact a scene with him in which he gave her an unwanted kiss.
Brittney then testified that on September 11, 2008 — that is, one year after the events at issue here — defendant invited her to meet him and a friend by the pool, and when she arrived there, he gave her two blue pills, which he said were Ecstasy, and told her that they “could do them later.” She put the pills in her pocket and later flushed them down the toilet.
Defendant now challenges the legal sufficiency and weight of the evidence, the trial court’s Molineux ruling and the People’s reliance on the contention that the complainant’s mental incapacity could have been due to the surreptitious use of GHB, although the indictment contained no such accusation.
*173 Initially, the evidence was legally sufficient to support the conviction of both counts. To establish defendant’s guilt of rape in the second degree under Penal Law § 130.30 (2), the People were required to prove beyond a reasonable doubt that defendant had sexual intercourse with the complainant when she was “rendered temporarily incapable of appraising or controlling [her] conduct owing to the influence of a narcotic or intoxicating substance administered to [her] without [her] consent” (Penal Law § 130.00 [6]). To conclude that a jury verdict is supported by sufficient evidence, “the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial” (People v Bleakley, 69 NY2d 490, 495 [1987]).
The complainant’s testimony regarding her blackout alone provides a basis for a rational person to find beyond a reasonable doubt that the complainant was incapable of appraising or controlling her conduct at the time she and defendant had sex. Moreover, the testimony of her classmates describing her unusual behavior that night, and the tests confirming the presence of Ecstasy in her bloodstream, combined with her denial of voluntarily ingesting the drug, was enough to permit the inference that her incapacitation throughout that night was involuntary, due to the administration to her of narcotic or intoxicating substances without her consent.
As to the sufficiency of the evidence establishing defendant’s guilt of facilitating a sex offense with the controlled substance Ecstasy (Penal Law § 130.90), the People were required to prove beyond a reasonable doubt (1) that defendant administered Ecstasy to the complainant without her consent, (2) that he did so with the intent to commit a felony defined in Penal Law article 130, and (3) that he committed or attempted to commit such a felony. The first element was sufficiently established by the laboratory test showing the presence of Ecstasy in the complainant’s blood, the complainant’s denial that she took the drug voluntarily, the defendant’s providing the complainant with wine at 7:45 p.m., and the expert testimony that the complainant’s conduct starting at approximately 8:30 that night was consistent with the presence of Ecstasy in the wine she drank at 7:45 p.m. The finding that defendant administered the Ecstasy with the necessary intent was sufficiently supported by testimony regarding defendant’s conduct throughout the evening. Finally, the element that de *174 fendant committed or attempted to commit a felony under Penal Law article 130 has already been established by the earlier discussion upholding the sufficiency of the evidence supporting defendant’s conviction of rape in the second degree under Penal Law § 130.30 (2).
Turning to the weight of the evidence analysis, we are required to “weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions,” and “decide[ ] whether the jury was justified in finding the defendant guilty beyond a reasonable doubt” (see People v Danielson, 9 NY3d 342, 348 [2007]; People v Cahill, 2 NY3d 14, 58 [2003]).
The jury’s determination was fully justified, since the evidence of defendant’s guilt was overwhelming on both counts. That he surreptitiously gave the complainant a drink spiked with Ecstasy at 7:45 p.m., despite his denials to the police, comports with her reported conduct as well as the experts’ description of the symptoms and effects of Ecstasy use. That he had sexual intercourse with her later that night is established by DNA evidence and the vaginal swab.
That the complainant remained “incapable of appraising or controlling [her] conduct” after 1:00 a.m. due to involuntarily administered narcotic or intoxicating substances was established by the complainant’s testimony that her blackout lasted all night, after she had been drugged with Ecstasy earlier in the evening. The expert testimony regarding the normal length of time Ecstasy continues to have an effect does not preclude a finding that the earlier administration of Ecstasy caused the complainant’s mental incapacity. The large number of alcoholic drinks that the complainant consumed throughout the evening does not, in these circumstances, establish that her mental incapacity later that night was voluntary. This is not a case in which the complainant created her own incapacity by voluntarily consuming alcohol before the sex act that formed the basis for a rape charge (see e.g. People v Shaw, 115 AD2d 305 [4th Dept 1985]; see also People v Johnson, 99 AD3d 591, 593 [1st Dept 2012, Abdus-Salaam, J., dissenting]). Rather, the evidence fully justified a finding that the complainant’s excessive drinking that night occurred after her judgment was compromised by Ecstasy, so that her continued incapacity after 1:00 a.m. that night, whether caused by Ecstasy, alcohol, or a combination of the narcotic and intoxicating substances, could rationally be attributed to her compromised judgment caused by the effects of the surreptitiously administered Ecstasy.
*175 The proven falsity of defendant’s exculpatory statement to the police, in which he claimed that he did not have sex with the complainant that night, undermines all his other protestations to the police. Moreover, his denial to the police of the use of drugs was undermined by the timing of the complainant’s symptoms, and its falsity was further buttressed by the testimony that he subsequently provided Ecstasy tablets to another young woman he was purportedly trying to represent as a client.
Defendant also challenges the validity of the conviction based on the use of evidence to show that he also surreptitiously administered GHB to the complainant. He argues that since nothing in the indictment specifically accused him of surreptitiously administering GHB as well as Ecstasy, it was improper for the prosecution to offer and rely on expert testimony suggesting that the complainant could also have been incapacitated by GHB that night.
Initially, defendant’s right to a fair trial was not violated by the expert testimony suggesting that GHB could have produced some of the complainant’s symptoms. While the indictment specifically identified the controlled substance used for the crime of facilitating a sex offense with a controlled substance, namely, Ecstasy, it did not name a specific substance as the cause of the incapacity claimed in the charge of rape in the second degree. Therefore, the People were not limited by the indictment to asserting that when defendant had sexual intercourse with the complainant, it was Ecstasy alone that had “rendered [her] temporarily incapable of appraising or controlling [her] conduct” (Penal Law § 130.00 [6]).
Admittedly, the expert testimony regarding GHB was too weak to serve as a basis for the conviction. It was essentially limited to the suggestion that GHB could have caused the complainant’s symptoms, and did not supply any basis for a finding that it was the cause. In comparison, in People v Rogers (8 AD3d 888, 892-893 [3d Dept 2004]), where the defendant was charged with rape while the victim was incapable of consent by virtue of being physically helpless, the Court approved of the admission of evidence connecting the defendant with the administration of GHB by showing that he had purchased and carried with him a product containing base ingredients similar to GHB, which the body can convert to GHB. Similarly, in People v Puff (283 AD2d 952, 953 [4th Dept 2001], lv denied 96 NY2d 923 [2001]), the charge of rape against the defendant arising *176 from his participation in the gang rape and sexual abuse of a young woman who lost consciousness after she consumed Ecstasy was supported by evidence that the defendant had provided the drug to her. Here, in contrast, there was nothing directly supporting the supposition that defendant had drugged the complainant with GHB, other than that some of her symptoms were consistent with the use of that substance.
However, the reference in the experts’ testimony to GHB and its symptoms, and the People’s reference to that evidence in support of their summation, did not impermissibly present the jury with a new, legally inadequate theory (see People v Becoats, 17 NY3d 643, 654 [2011], cert denied 566 US —, 132 S Ct 1970 [2012], citing Griffin v United States, 502 US 46, 59 [1991]; People v Martinez, 83 NY2d 26, 36 [1993], cert denied 511 US 1137 [1994]). Rather, at worst, the suggestion that the complainant may have also been drugged with GHB was merely a “factually unsupported theory” (Becoats, 17 NY3d at 654). “[W]here jurors are given a choice between a factually supported and factually unsupported theory, it is assumed that they have chosen the one with factual support” (id.). Here, we can assume that in determining whether the complainant was “rendered temporarily incapable of appraising or controlling [her] conduct owing to the influence of a narcotic or intoxicating substance administered to [her] without [her] consent,” the jurors relied on those of the People’s assertions that were supported by the evidence.
The weight of the evidence, even leaving aside the testimony regarding GHB, provided overwhelming justification for the jury’s verdict of guilty of rape in the second degree.
Finally, while the trial court, in making its Molineux ruling, failed to recognize that evidence of “bad acts” that should be considered in a Molineux application can include evidence tending to establish the defendant’s bad character as well as criminal acts (see People v Agina, 18 NY3d 600, 603 [2012]), the improperly admitted portions of this evidence to which defendant objected were not so prejudicial as to warrant reversal. As for portions to which defendant did not object, we decline to review his unpreserved claims in the interest of justice.
With regard to Christine C.’s testimony regarding the night before the events at issue, defendant objected only to her testifying that after defendant shaved her leg, he told her not to say anything to anybody because people wouldn’t understand the nature of their relationship. However, the prejudicial impact of *177 that statement is minor at best; it merely acknowledged his recognition that most people would likely disapprove of his conduct toward the young woman, although she had permitted it.
The trial court in its Molineux ruling properly allowed Brittney E. to testify regarding the incident in which defendant gave her Ecstasy pills one year after the events at issue here. Although not relevant to the primary issue of whether defendant would surreptitiously drug someone with Ecstasy, that evidence had some relevance to the question of defendant’s ability to obtain the drug and his willingness to provide it, despite his protests to the police. The relevance of the rest of Brittney’s testimony was primarily to provide background and context for that event; the necessity of that context information outweighed the potential prejudicial impact of its echoing the complainant’s portrayal of defendant as a sleazy predator who obtained intimacies from ambitious young women by purporting to offer them career assistance and connections.
Accordingly, the judgment of the Supreme Court, New York County (Bonnie Wittner, J.), rendered April 22, 2009, as amended April 30, 2009, convicting defendant, after a jury trial, of rape in the second degree and facilitating a sex offense with a controlled substance, and sentencing him to concurrent terms of five years, should be affirmed.
Andrias, J.P., Moskowitz and Manzanet-Daniels, JJ., concur.
Judgment, Supreme Court, New York County, rendered April 22, 2009, as amended April 30, 2009, affirmed.